511 So.2d 289 (1987)
Johnny WILLIAMSON, Appellant,
v.
STATE of Florida, Appellee.
No. 68800.
Supreme Court of Florida.
July 16, 1987.
Rehearing Denied September 10, 1987.
*290 Michael E. Allen, Public Defender, Second Judicial Circuit, and David A. Davis, Asst. Public Defender, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen., and Andrea Smith Hillyer, Asst. Atty. Gen., Tallahassee, for appellee.
EHRLICH, Justice.
Johnny Williamson appeals his conviction of first-degree murder and sentence of death. We have jurisdiction, article V, section 3(b)(1), Florida Constitution, and affirm both the conviction and sentence.
While inmates at Cross City Correctional Institution, the appellant, Johnny Williamson, and his "partner" Omer Williamson (no relation) were selling marijuana for Daniel Drew, also an inmate at that facility. According to Omer Williamson's testimony, Omer owed Drew $15 in connection with a marijuana sale. Omer decided not to pay Drew because Omer believed Drew had been lying to him. When Omer told the appellant that he did not intend to repay Drew, Williamson said that they would have to kill Drew because Drew was "a country boy" who would stab Omer if he didn't pay his debt. "Chickenhead" Robertson, another inmate at the facility and co-defendant in Williamson's trial, learned of the plan to kill Drew and offered to look for a knife. When Robertson and Williamson were unable to find a knife, Omer went to his cell and got a metal rod from the sink which Drew had previously sharpened to a point. While Robertson acted as a lookout, Williamson and Omer went to the maintenance shop building where Drew was working. Williamson asked an inmate working at the shop to send Drew outside. When Drew came out Omer stood behind him, while Williamson gave him $5 so that it would look like they had given Drew less than Omer owed him and he had gotten upset and pulled a knife on them. Williamson then told Drew that Omer was having trouble getting the rest of the money and needed a knife to collect. Drew had apparently made a knife for Williamson and gave it to him at that point in the conversation. On Williamson's signal, Omer grabbed Drew by the throat from behind. Williamson stabbed Drew and a struggle ensued, with Omer throwing Drew to the ground, kicking him in the head several times. Williamson continued to stab Drew with the knife. When Omer became "grossed out" he gave Williamson the rod and left. Williamson then straddled Drew stabbing him repeatedly with the knife and metal rod. After leaving Drew, Williamson then returned the rod to Omer and gave the knife to Robertson. Omer returned the rod to the sink in his cell and Robertson put the knife in a cast he was wearing, eventually burying it underneath a tree where it was later found.
*291 Williamson, Omer, and Robertson were charged with first-degree murder and the unlawful possession of a knife while an inmate. Omer pled guilty to first-degree murder and agreed to testify against Williamson and Robertson in return for the state's agreement not to seek the death penalty. Williamson and Robertson were tried together. Robertson was found guilty of the possession charge. Williamson, who did not testify during the guilt phase of the trial but did testify during the penalty phase, was found guilty of both charges. Following the jury's recommendation of death, the trial court imposed the death penalty, finding three aggravating circumstances: 1) the capital felony was committed while Williamson was under a sentence of imprisonment; 2) Williamson had been previously convicted of a violent felony; and 3) the murder was committed in a cold, calculated and premeditated manner without a pretense of moral or legal justification. The trial court found no mitigating circumstances.
The only claim which Williamson raises in connection with the guilt phase of the trial involved a comment by the prosecutor made during closing argument concerning Omer Williamson's plea of guilty to first-degree, premeditated murder. During the state's direct examination, Omer testified that he had been charged with and had pled guilty to first-degree murder and possession of contraband while in prison. No objection was made to the state's questioning concerning this plea. Further, during cross-examination by counsel for Robertson, Omer testified that in exchange for his plea and agreement to testify against Williamson and Robertson the state agreed not to seek the death penalty. A copy of Omer's offer of plea was later entered into evidence by appellant's trial counsel.
Williamson does not contend that Omer's guilty plea was improperly brought to the jury's attention. See Parker v. State, 458 So.2d 750 (Fla. 1984), cert. denied, 470 U.S. 1088, 105 S.Ct. 1855, 85 L.Ed.2d 152 (1985) (As a general rule, it is improper for the state to disclose that another defendant has been convicted or has pled guilty.). Rather, he directs our attention solely to the prosecuting attorney's reference to Omer's guilty plea during the state's rebuttal to co-defendant Robertson's closing argument. Williamson maintains that "during the state's closing argument, the state alleged that Williamson must be guilty of first-degree murder because his co-defendant Omer Williamson had pled guilty to first-degree murder" and such a "guilt by association argument" had an "unfair prejudicial impact upon the jury and was reversible error." We cannot agree with Williamson's characterization of the state's argument and conclude that the statement complained of was proper comment on the evidence in direct rebuttal to the closing argument of Robertson's counsel.
In rebuttal to Robertson's closing argument the prosecuting attorney argued:
Now, [counsel for Robertson] said that looking at Presley's testimony and looking at what Chickenhead [Robertson] said after the killing to Bishop, that nobody knew there was going to be a killing ahead of time. That Omer said he was just going in there to collect a knife  or to get a knife to collect on his debts. Well, I find that very interesting. When [Williamson] was out earlier in the morning, looking for a knife, saying, "I'm going to kill him." When they told him, when Omer  if that's the case, then we're talking about a manslaughter case maybe? What did Omer do? He pled guilty to first-degree murder. Now does that make any sense? If it wasn't premeditated, why would Omer have subjected himself to first-degree murder?
Counsel for appellant made a motion for a mistrial "because the obvious inference from [the prosecutor's] statements is that in light of the co-defendant's plea to the charge, these defendants must also be guilty of the charge." The prosecuting attorney explained his argument as follows:
No, that's not it at all. This is an argument in direct rebuttal to [Robertson's counsel's] argument that they didn't know, that Omer's own statement was they didn't know there was going to be a *292 killing. And both he and [counsel for Williamson] talked about manslaughter. Now, what we're talking about here  all I'm saying is that it doesn't make sense for him to plead guilty to first-degree murder if all it was was manslaughter that he did. That's what I'm saying and that's not a mistrial.
The trial court then denied Williamson's motion.
It is clear from the record that the state was not attempting to make a "guilt by association argument." The state was merely attempting to rebut the following argument made by counsel for Robertson:
Ronnie Jerome Presley is the witness that [the prosecutor] didn't tell you about, as he put it.... [O]ne thing I asked him about was, I asked, "Didn't Omer make a statement to you, after the fact, after Drew had been hurt and stabbed and so forth?" He said, "yes, sir he did."
And I asked him, "Well, what was it?" Okay. And the statement was  and this is what Omer told Presley. Okay. Said, "We went to maintenance to get me a knife so I could go out and collect some money." Do you remember that? Now, folks, that is very important to this case, because that tells you  that comes from Omer's mouth  the real reason that he went to maintenance to begin with, purely and simply, he went over there to get a knife so he could get back out on the compound and collect some money that he owed.
.....
Okay. Now, strangely enough, at about the same time, that is shortly after this thing happened, while Omer is telling Presley the reason they went over there. .. . [T]here is Chickenhead and Mr. Bishop sitting out in that area there. And Bishop asked him, "Chickenhead what happened? What's going down? What went down? What happened?" And what did Chickenhead tell him? According to Bishop, the same story that Omer was telling Presley. Chickenhead told him, "I went to maintenance with them. I thought I was a lookout while Omer went back behind maintenance to get his knife so he could go out and collect some money."
The above excerpt makes clear that the prosecuting attorney was simply attempting to rebut Robertson's contention that Omer went to the maintenance area intending to get a knife from Drew by pointing out to the jury that such a scenario was not logical in light of the fact that Omer pled guilty to premeditated first-degree murder. Under the circumstances this was fair comment on evidence which was properly before the jury. Accordingly, the trial court did not err in denying Williamson's motion for a mistrial.
Although Williamson does not challenge the sufficiency of the evidence to support his convictions of first-degree murder and possession of contraband while in prison, we have thoroughly reviewed the record and find sufficient record support for both convictions.
Next, Williamson raises two claims in connection with the penalty phase of the trial. He maintains that the trial court erred: 1) in sentencing him to death when his co-defendant Omer who was equally culpable received a life sentence and 2) in finding that the murder was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification, section 921.141(5)(i), Florida Statutes (1985). We find both of these claims to be without merit.
Although the sentence that a co-defendant receives is relevant and may be considered by the judge and jury in determining the appropriate sentence, Bassett v. State, 449 So.2d 803 (Fla. 1984), it is apparent that both the trial judge and the jury in this case were aware of Omer's plea agreement and of the likelihood that he would receive a life sentence. There is also sufficient evidence from which the jury and the trial court could have concluded that Williamson was the "dominant force behind the homicide." See Marek v. State, 492 So.2d 1055 (Fla. 1986). There was testimony that Williamson first suggested the killing, that he formulated the plan and recruited *293 Robertson as the lookout, and that he was the one who repeatedly stabbed Drew. As we have previously noted, it is permissible for different sentences to be imposed on capital co-defendants whose culpability differs in degree. Id. Hoffman v. State, 474 So.2d 1178 (Fla. 1985).
Finally, we reject Williamson's claim that even if the murder was cold, calculated and premeditated, he had "at least a pretense of moral or legal justification" for having committed it. Williamson argues that he "murdered Drew because if he did not, Drew would have killed Omer Williamson and perhaps himself for not repaying a $15 drug debt Omer Williamson owed to Drew. Moreover, when Williamson confronted Drew, Drew kept his hand in his pocket an act which worried Williamson because it was unnatural and merited watching." Williamson relies on our decision in Cannady v. State, 427 So.2d 723 (Fla. 1983) and maintains that these suspicions concerning Drew amounted to a pretense of moral or legal justification.
We find this case clearly distinguishable from Cannady v. State. In Cannady the only direct evidence of the manner in which the murder was committed was Cannady's own statements. Cannady repeatedly denied that he intended to kill the victim and had explained during his confession that he shot the victim when the victim jumped at him. In the instant case, Omer testified that the appellant decided that they had to kill Drew because if Omer was not going to pay Drew the $15, Drew, a country boy, would stab Omer. According to Omer he and Williamson went to the maintenance shop area after planning the murder. There is no evidence of any threatening acts by Drew prior to the murder; nor is there any evidence that Drew planned to attack either Omer or Williamson. Based on the record before us, we conclude that this aggravating factor was proven beyond a reasonable doubt.
Accordingly, having thoroughly reviewed the record and having found no reversible error, we affirm both the convictions and the sentence of death.
It is so ordered.
McDONALD, C.J., and OVERTON, SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.